We'll go around with Judge Higginbotham and Judge Higginson. We're ready to go. We'll call the first case, 23-10715, Premier Electronics v. ADT. Mr. Frick, you're up, sir. Good morning, Your Honors. Today I'm going to be addressing two of the different issues that we have briefed in this court. First of all, we're going to address that Judge Brown correctly denied the motion for summary judgment that ADT had filed in the case and that Judge Lindsey subsequently, upon reconsideration, incorrectly granted that same motion. And then the second issue that I will address today is that the trial court abused its discretion in excluding certain evidence, including an expert report that were supplemented after the discovery deadline in this case. With respect to the first issue, the summary judgment, this is a classic tortious interference case. My client, Premier, had a contract with 917 individual homeowners in a particular development called Phillips Creek Ranch. We'll refer to that often as PCR. ADT interfered with those 917 contracts, first of all, by lying to PCR's customers in order to gain access into their homes. And secondly, by hindering ADT's, by hindering Premier's performance of his contract by reprogramming or replacing the report below determined that Premier's individual security monitoring contracts with each and every homeowner was coterminous with a bulk billing agreement that Premier had negotiated with the developer of the entire neighborhood and the Homeowners Association, the HOA, several years before. Now, that contract was negotiated in 2016 as part of a big bid proposal pursuant to which Republic Property Group wanted to start three different master plan communities. And the genesis of this was they were going to provide security services to all of the homeowners in all three of these individual communities through the Homeowners Association. By doing this, concentrating a single security provider in a single neighborhood, this produced considerable savings. It produced savings to the developer. Their homebuilders only had to deal with one security company. When you say Judge Lindsey's reverse course from Judge Brown, it appears that happened at a pre-trial conference that it seems lasted about two and a half hours long. That's not in the record here, the transcript of the pre-trial conference where he explains why he changed his mind, is it? Well, no, he didn't explain in a pre-trial conference. But that is where his order indicates that's when he changed his mind. Well, no. He decided at that time that he would reconsider Judge Brown's motion. Okay, but you recall it's not a transcript and it doesn't have elaboration so it wasn't needed. Correct. He just decided, we were in a pre-trial conference for trial and he said, wait a minute, I want to go back. One of the things that we had asked the judge to do was reconsider a prior ruling concerning one of the exhibits and he said, I'm going to not only do that, I'm also going to go back and look at the summary judgment that the court previously granted. And the logic in his order, which is what we're reviewing, is fairly straightforward. It's that the supplement really is ancillary. It was part and parcel. When you look at the underlying security agreement, it's part of that. It's integrated in it. And therefore, we don't need to reach these factual issues because there was no separate contract. That is exactly what the judge, Judge Lindsey, ruled in his opinion and that's exactly what ADT argued. But that's not true. Not true both operationally and legally? Or you agree that operationally these separate contracts didn't even have any terms about a charge for necessary basic underlying services? They, the contracts with the individual homeowners said that the fees would be paid by the HOA for the monitoring service, consistent with the association agreement, but any additional services... But you understand my question. When that underlying, this is the logic, when that underlying agreement terminates, which is not something you've appealed, if this allegedly freestanding agreement doesn't even have any ability to operate because it's predicated on a control panel and basic services that no longer exist, that's operationally not a separate agreement. Well, operationally we don't agree with that based upon the summary judgment evidence. As the summary judgment evidence shows, the control panel and the ancillary service, the cellular service, which was the most popular additional service, so you wouldn't need a landline for your phone system to work, does not depend upon the underlying agreement at all. But there's nothing in that separate agreement that even suggests the homeowner has to pay for indispensable connectivity, is there? For the cellular connectivity? If you just have this separate supplemental fire cellular, is there anything in that agreement that contemplates absolutely necessary basic connectivity? Yes or no? Are they being charged for that? When they're paying $15.99 for the fire and the cellular? Are they being charged for the underlying monitoring? Yes. Well they are, but the homeowner's association is collecting it as part of their dues. They are not separately paying for it. You haven't appealed that that properly is over, it's terminated. We have not appealed that, we have not appealed, first of all, whether it's properly terminated or not is an issue between us and the homeowner's association and its management company. I'm really just asking a mechanical question. Could these allegedly freestanding existence, could they even get service all by themselves, four corners, that's it? Absolutely. Absolutely they could do that. And just to be clear, what we're not appealing is we say that ADT did not interfere with the homeowner's decision, the property management company's decision to terminate that service. We don't admit that the, we don't concede that it was properly terminated. What we concede is that the evidence developed in the trial is that ADT is not what led to the underlying contract being terminated. What ADT did have however, in conspiracy within. But we're still on whether there is a separate contract. So if we look at the security assistance agreement, the underlying one, section 18 does say the exhibits are integrated. It does say the exhibits are integrated and the exhibits say in substantially this form, they entered into an agreement that was individual agreements that were substantially in that form, but not identical. And for three years, none of the parties to the contract ever said, the summary judgment evidence is everyone knew the agreements that were entered into. When you say not identical, the main agreement says three years and it's over. And then exhibit D doesn't have a different duration. It doesn't have a term, it doesn't mention it. But a duration is critical to a service contract. Correct. So you've got a three year and then you've got an attachment. And when you say not identical, it looks like what was then negotiated was inconsistent. You mean what was negotiated? Yeah, the five year provision. Well, what was negotiated with the homeowners, which the homeowners association, the developer and the summary judgment record says everyone knew was ultimately negotiated with the homeowners. Yeah. Had a different provision. That's why, I mean, you didn't file a reply brief, correct? Did not. No. So we've got 35 pages of argument from ADT you haven't yet answered. Well, they cite, they cite a lot of Texas law about you don't have authority unilaterally to modify that three year provision. But all of those cases concern where the party to the agreement, the homeowners association or the developer comes in and says, premier, you modified our agreement without our agreement. You're breaching your agreement with us. We're not going to allow this. You need to go back and have them sign new contracts. That's not this case. In this case, no one who was a party to the actual underlying bulk billing agreement said what Premier did was wrong. The only argument that is being made that the modification is by ADT, who's a stranger to the contract. They're not a party to this bulk billing agreement. They're saying after the fact, oh, you should have signed this security monitoring agreement instead of that one. More importantly, the underlying bulk billing agreement is also very, very clear that a, that premier has to enter into a completely separate agreement, the form of which is not specified whatsoever in the bulk billing agreement for additional services. Similar to? No, for the additional services. It doesn't say anything about similar to anything. I thought it was said similar to exhibit D. That's for the monitoring service. For the additional services, it says if they want additional services, they must enter into a separate agreement. Okay. So the separate agreement for the, and what basically they did is they merged the additional agreement for separate services with this agreement for monitoring services, made it so the homeowner only has to sign one agreement and they can check, do I want this additional service? Yes or no? Here's how much this additional service is going to cost. You're responsible for it. More importantly, it says in, in section 2A when it's talking about the payments and payments under the association that when the association agreement ends, if premier continues to provide services or provides additional services beyond the monitoring agreement, then the homeowner is responsible to pay for those. But it does not specify, I agree with you, it does not specify the price in the individual monitoring agreements. That's only specified in the association agreement at $13.50 for the monitoring, including tax. They don't tell the homeowner how much that is. Okay. In, in the homeowners agreement. I, I can see that that's the point. But with respect to do they terminate at the same time, there's nothing in the bulk billing agreement that says these contracts all terminate at exactly the same time. In fact, the additional services in, in the, the record is replete with this, that the parties contemplated that 100% of the neighborhood would have these requests for proposals. At the time that the termination happened, they had not yet reached 100% of the 2300 homes. There were only 917 homes. Were you counsel below? Yes, I was. So you remember the June 21 hearing in front of Judge Brown on this? Yes. Because there you recall telling her that the theory, your theory is that there's nothing anywhere in any of the documents that says the HOA can ever switch to a new security provider. That's absolutely true. There's nothing in the agreement that says the HOA can ever switch to a new service provider and what the parties, but they did switch to ADT. They did. They gave notice and they terminated and that's not before us. That's not before us because that's our dispute with them. That's our dispute with the HOA. My, my, my point is these individual homeowners are negotiating in your theory, your secondary theory, a specific standalone agreement with you, but it can't be a standalone. It's premised on what you said to judge Brown that there's gotta be the underlying basic service. These standalones don't provide that. Therefore, your theory has to be that these homeowners are stuck with something that doesn't work. Well, that's not entirely true. As was discussed in both briefs, the cellular transmittal service only transmits the alarm signal to the alarm monitoring center. And typically if a new, if a new company were to come in and say, I'm going to be providing monitoring services like ADT did, all you would have to do is basically forward that, the same cellular alarm service that Premier has been providing all along. You would forward it to their call center. It's like a cell phone. Okay. It's calling a number. It's programmed to call this number, which is Premier's alarm monitoring service. Premier can hire a different alarm monitoring service and say, okay, now I'm going to send it to phone number B. ADT comes in, we can. Time's running out. Your, your theory is if you prevail, the theory is these homeowners are getting everything to make it work for $15.99. You've got to come in and, is that your theory? That's my theory. They would, they would get, they would continue to get the monitoring service until they decide. And the reason that's important is under the Texas Private Security Act, a security company like Premier must, it's required by law that we enter into individual agreements with each and every homeowner so that the homeowners can control when their service is terminated. So that the homeowners are the only individuals who can call up the security company and say, hey, I don't like you anymore. I want to switch to ADT. I want you to terminate your service. There's summary judgment evidence that homeowners gave in the court that said, we didn't want to switch. No one asked us. We were told that if we didn't switch, we would never have, we could not have home alarm system. And that was simply false. Premier would have continued to provide service to those homeowners indefinitely under their agreement until Premier or the homeowner Working with the supplemental services, but all for $15.99. Well, they would have asked for $13.50 because it says No, no, no, no. Oh, they would have asked for $13.50 more. Or the monitoring because That's the problem. That suggests these two agreements are integrated. I thought they'd have to ask for that because they need to pay, someone's got to pay for the underlying stuff. The law implies a reasonable price and a reasonable price would be $13.50. I see I'm out of time. I will address my other argument in Rebuttal is rebuttal. So we'll see. All right, let's hear from ADT. Yes, please. The court. If you take Premier's argument and run it to its logical extension, they unilaterally controlled the underlying security service agreement for life. Because as long as they had one of the ancillary contracts in play out of this whole subdivision, they would argue that nobody could touch any of the contracts in that subdivision. So even though the underlying and necessary master contract, the security service agreement had a three-year term, it's undisputed that the Homeowners Association validly canceled it. Under Premier's theory, which is both contrary to the law and not consistent with ordinary business practices, they could hold unilateral control simply by redefining the terms of these ancillary agreements and by continuing to sign up new homeowners when new homes were built with a five-year term. As far as I know, we're just focused on the separate agreement they signed. You didn't sign. The homeowner didn't sign. It looks like a standalone agreement. So why is it part of this when it's separately signed, separately dated? Well, two separate sources, Your Honor. If you look at that contract itself, if you assume that contract is valid, it itself incorporates by reference the underlying security services agreement. So the security services agreement, the master contract with the HOA, is incorporated into 855 and the joint appendix. So that addresses question one. If we assume that contract is valid, and there was some unilateral behavior based on the modification of Exhibit D, which calls that into question. Well, but this agreement says clearly, this agreement constitutes the entire agreement between Premier and the homeowner, the entire agreement. And it seems to me everything in the underlying separate contract is saying, if you want to do extra stuff, that's your business entirely with the homeowner. I just, that contractual language seems very hard to reconcile with the district court saying, these are one and the same. I think where it has to be reconciled, Your Honor, and I understand the thrust of that argument, it has to be reconciled because the practical feature of the security services agreement is none of this works without that base underlying agreement. That is overwhelmingly what Judge Lindsay said, the practicalities of it. That sounds like a policy argument. It could just be inartful agreements. But why does ADT get the benefit if they may not be right? You may still win. But I don't know why we can affirm that legally these two separate documents that refer to each other as separate are, in fact, one and the same. What's your case for that proposition? You can for several reasons. One, I think the best case on that is the Don Hoskins case that's cited, that the district court cited and that we cited a couple times in the brief. So the issue there is, in performing this contractual analysis, there's a couple parts to that that are made without dispute. One, you can incorporate things by reference like Exhibit D. There's supposed to be in Exhibit D substantially similar terms. Then Premier essentially morphs parts of that together and then adds on other parts to where you don't have coterminous terms for the contracts with additional service. So what's the rule of law from Don Hoskins when I read it? It's that if you're allowed to do a separate agreement with people, but it differs as to a material term, that nullifies the separate agreement? Is that what I'm going to see in that case? Essentially. The analysis comes to that conclusion, but the pathway there is a little bit different. It essentially says that courts in construing contracts can reasonably imply terms that aren't specified. So here in the underlying agreement, there's a three-year term. It was a unilateral modification to include a term that was different from the term of the base agreement, without which you would not be able to perform or have the service agreement. Slightly begging the question of, is it a different agreement? And I sort of just very different date. ADT is not there. The HMO is not there. I'm still wondering, are you unilaterally modifying the same contract? But I agree with you, it doesn't seem to be able to work operationally. It doesn't work operationally. I know, but is that relevant? It is. It is relevant because, again, both legally and operationally, legally the contract 855 and the JA, these individual homeowner agreements, incorporate by reference the base contract. They have to, because without which they don't work. That is the base underlying agreement to provide service, monitoring, and the essential hardware necessary for this contract to work at all. The ancillary agreements, which then become baked into the same individual homeowner agreement, are for just some of the contracts in that subdivision, and they add pieces of equipment. But legally, you have the fact that the contract has incorporated by reference the master agreement, and then operationally, without that, where there are ancillary services, they don't work. So essentially the homeowners' individual agreements are incorporating the relevant provisions of the security systems agreement that comes to an end. So where Don Hoskins comes in and some of the principles that it cites to Texas Supreme Court law is where you have a case like this, and Texas law avoids defaults in contracts, to nullify a contract because there's either a missing term or it fails its essential purpose, which is what could happen in a scenario like this where you can't reconcile the termination of a critical component of the operation of this contract. So Don Hoskins says under those types of circumstances, courts can imply reasonable terms. Duration of performance and duration of payments are an essential term that oftentimes that case recognizes courts can imply. And so what the district court did there is said, based on the surrounding circumstances, which the court as a matter of law is allowed to take into consideration when deciding what term to imply, this contract makes absolutely no sense unless the duration of the master underlying service agreement is coterminous with the individual homeowners' agreement. To be clear, the agreement initially is with the HOA. Correct. My understanding of HOA law is that the HOA can bind the members. Members may have a quarrel with what the board does, as they frequently do, but their options are to elect a new board. Right. Which the HOA is the one that is the primary contractor here, and it has a master contract. And through that master contract, they also have the option of individual homeowners to some selectivity about the nature of the civic services themselves. But the key to this, in one sense, is that, at least to me, it's essential to keep in mind that the primary contract is with the HOA, meaning you're dealing with a board of directors of HOA with a master contract. And individual owners, as a member of the HOA, don't have that except as provided in the master contract, do not have separate contracting relationships with this company. They can opt it. It's not mandated. They can't choose to or not to. Correct. Is that a fair? I think that's a fair answer. I sort of back up, get the big picture of the HOA's relationships. Yes, I think big picture, that is correct. And even if individual customers disputed that or wanted to go a different route, recall that when they sign those individual homeowner agreements, it does incorporate the HOA's contract with whichever service provider into those contracts. So I think, to Judge Higginson's question, if you look at, and in fact, the Don Hoskins case involved an almost, it's very difficult to find a fact pattern substantially similar to this, but it's about as close as you can get. It involved a commercial lease where there were addendums to a parking lot agreement, disputes had arisen, and there were like five different addendums. And essentially, the case went to trial, but summary judgment had been awarded to the defendant on its counterclaim related to the landlord taking away the parking. And it got summary judgment from the court. The court modified the duration of this parking lot, this TPA parking lot addendum, to extend it to be coterminous with the underlying lease agreement. And so the reason why, as a matter of law here, we can grant summary judgment, is when we look at, from a practical aspect, the underlying relationship, having this parking lot agreement that goes a different duration than the overall lease makes no sense. And I think that's as close to being on all fours as you can get to this case, even though we're obviously in very different industries. It's the same circumstance here. The baseline agreement is the baseline. You add some services to it. If you allow somebody to take essentially the tail and make it wag the dog with these additional contracts, that doesn't make any correct in implying this reasonable duration term to the ancillary agreements. I would like to — Well, I mean, just devil's advocate on that, does it make sense, though, that we — what the essential logic of that outcome would be if individual homeowner negotiates fire and cellular separate two weeks before the underlying terminates, they've only got two weeks of their fire and cellular? In other words, you're saying they terminate at the same time. So you should negotiate and it's done in two weeks, what you've just separately negotiated for? That's right. That's right. And I think the issue there, again, Your Honor, for the separate contracts, Premier would have the ability to say, look, I've got a notice of cancellation here that my contract is ending. I can do this installation, you know, but you're going to have to pay mostly up front. Premier has the ability to build in its costs a different way. And by doing the opposite, they're saying, in order — since I'm not getting the entire development area, I've just got a few of you, this is going to be very costly for me to install and I may lose in two weeks. Therefore, I need you to agree this will be good for five years. And they write in the five-year duration. Doesn't that all make sense? No, it doesn't make sense because Premier knows that its underlying agreement for the system that makes the system work is coming to a conclusion. So I think your options there are to say, look, our contract has ended. In fact, there was a period of time where — They would have to disclose, hey, homeowner, you may not know, but it's about to end. Correct. Well, I don't think they would — I don't think there's any legal responsibility. I don't think they would run into liabilities if they don't disclose that. But as a business, in meeting with the customer, if the customer says, I'd like to add this additional protection, you know the duration of your contract because that contract is also being incorporated into the customer's contract. You know Premier knows. Premier knows, exactly. And yet they've said in that contract five years. Homeowner wouldn't know. Wouldn't know it's going to end in two weeks. They'd see five years, I'm going to get five years. Except for — true. Except for the fact that it incorporates, by reference, the security systems agreement and the top of it is the base underlying contract. So you have that tension there with incorporating that by reference. And I think that comes back to the fundamental purpose why these — the only way to read this transaction reasonably is what Judge Lindsey did. You could do it again. Tell me in the separate agreement where the incorporation of the master is. Is it in that first scope of services? It's in that first paragraph. Okay. I don't have great eyesight. It's in that first paragraph. Paragraph. Let me — Because that's pretty important because it's in tension with the start of the section six that says this is the entire agreement. But I'm sure it's there. But do you see my anxiety here? Yeah. Hold on. Let me find that. And as I'm finding it, Your Honor, I'm going to put a mental flag that I would like to, before I run out of time, get to the — You got still seven minutes. Yeah, I do. I'll stop asking questions. No, no, no. You're fine, Your Honor. I would like to get to the alternative argument about justification because in some ways I think that may be the most efficient path to affirm. It is a little small in the appendix here. So it's in numbered paragraph one. Premier shall provide monitoring and maintenance service of the system in accordance with the terms of the security system agreement originally entered to by Premier and the Association. So it's the very first sentence of paragraph one related to the scope of the service. In accordance with the term of the agreement originally entered. Okay. I see that. Yeah. And you see security system agreement — Proper noun as defined in there and is intended to reference that master agreement. So switch gears to the justification argument. As this Court knows, it can affirm the district court judgment on any basis that's in the record. We argued both before Judge Brown and Judge Lindsey alternatively that justification is a legal basis. Justification can be both a legal or a factual basis to defend a tortious interference case. In this case, it's a legal one because it is absolutely undisputed and uncontroverted that ADT had a protected legal right to pursue its contractual obligations with these individual homeowners. It is not disputed that the security system agreement was canceled. It is not disputed that the HOA validly entered into a substantially similar contract to the security services agreement with ADT. It's not disputed that that contract has an exclusivity provision that gives them first access to the homeowners for the installation of a security system and to add ancillary services, which I would say that ADT's contract provided the cellular radio and the monitoring for less money, all inclusive of the agreement, which was part of why the HOA switched providers. But with those facts not being disputed, ADT has a legal right to pursue its relationship with the homeowners. So if you look at the Texas beef case from 1996 from the Texas Supreme Court, that case says where you have a protected legal interest in a contract, a valid and binding contract that's not disputed, is just that as a matter of law. Where it can become a fact issue under that case, and this comes from, I believe, page 211 of that opinion, it can be a fact issue if the defendant believes that the defendant has a protected legal right to pursue some sort of course of conduct, but that turns out to be wrong. If that expectation was a bona fide expectation and reasonably held, then it's a jury question. But where you have an uncontroverted record of a business expectation through a contract that's a protected legal interest, you have an absolute right to pursue that. And the Texas beef case went one step further and said when you have that protected right, even if your conduct is ill-willed, malicious, intentional, that doesn't matter, because this is a business contract. You have a right to pursue it, and that is a defense as a matter of law. So I would suggest to this Court if this Court finds navigating some of the contract principles that ADT believes Judge Lindsay got right in addressing the construction of these and trying to harmonize these contracts, we believe the district court got that analysis correct. The pathway to affirming this with less analysis would simply be to say the Texas beef case says when you have a valid contract, that's a protected legal interest and it is a complete defense to a tortious interference claim, and there is absolutely no factual dispute that that contract with ADT existed and that the prior one with Premier was canceled. So the Court could also affirm on that basis. And if the Court at this time doesn't have any additional questions. Counsel Oppsitt took on Judge Lindsay's reconsideration of Judge Brown's ruling. What comments, if any, do you have about that? Yeah, I think procedurally what Judge Lindsay did was perfectly appropriate. And to provide the Court with a little more context, Judge Higginson is correct. The transcript from that hearing was not in the record. So there was a pretrial conference that occurred, and the genesis for reconsidering summary judgment was in addressing some of the practical legal issues for trial. Judge Lindsay raised the issue of it sure seems like we're trying some issues of law wrapped up into this. There's a lot of contract issues that juries don't interpret, I interpret as the judge, and I feel like we need to, the Court needs to address those before if we try this case, we can properly try it. And so that was, and that's paraphrasing what happened at that hearing. Judge Lindsay said, I'm going to go back sua sponte and look at the summary judgment order, and that will help me know what there is to try, if anything. So I'm going to reconsider that briefing. And I believe Judge Lindsay said if I deny that, then that could impact some of these in limine and jury instruction issues. But I need to start and have an understanding as to what was decided and what are issues of law of contract interpretation for the Court and what, if any, factual issues exist. And so to Judge Higginson's question, there were not any findings or analysis made on the record. Judge Lindsay reached that conclusion and then went back and reassessed the motion, and then the order came out some months after that. If there are no further questions from this Court, we would ask that either based on the contract interpretation or the alternative ground of justification that this Court affirm Judge Lindsay's well-reasoned decision. All right. Thank you, sir. Thank you. All right. Mr. Frick, we're back to you for rebuttal. I agree with counsel as to why Judge Lindsay did this. The question is, is the contract ambiguous or unambiguous? And the issue that both parties say is that the Court can consider the surrounding circumstances in making a legal construction of an unambiguous contract. Where Judge Lindsay erred is he focused on the circumstances as they existed in 2016, after ADT came in. And that is what the law says you cannot do. You cannot focus on circumstances that arise later to construe a contract if you find it unambiguous. You can, however, focus on the circumstances that existed at the time the contract was signed. That's what our summary judgment evidence was. At the time the contract was signed, none of the parties to the contract ever anticipated a new service provider ever coming in. What the summary judgment evidence shows is that during build-out, the builder would control the association. It would have more votes. But after the division was complete, it would turn over the association's management to the homeowners. They would elect a board of directors. The board of directors might decide in the future, you know what? We don't want to have to deal with the security company anymore. You're on your own, homeowners. And, in fact, if you look at Exhibit B, both of the security monitoring agreements, both the one attached as Exhibit D in paragraph 2 and both the one that the customer signed in paragraph 2A, it very clearly says that the homeowner understands the association does not provide and has no obligation to provide monitoring or maintenance services for the alarm system. I mean, that's embedded both in the proposed form and the one that all of the homeowners actually signed. At the time the contracts were negotiated, what was anticipated was that at some future date, the homeowners association wouldn't be collecting the monitoring fee as part of the dues of each homeowner, and that, instead, each homeowner would have to contract separately. More importantly, both our bulk billing agreement and ADT's bulk billing agreement actually give the individual homeowners an out. It actually says in there any individual homeowner can decide that they don't want security monitoring services from Premier or from ADT. For example, if you had a nephew who was working for Vivid, a competitor that both ADT and Premier have many dealings with, you might decide, I want my home to be monitored by the company that my nephew is selling for, Vivid. A homeowner could elect to say, I'm going to go with someone else entirely. How that impacts this case is every single homeowner could decide to go with Premier. Just because your time is running out, this is always my difficulty when a reply brief is not filed. He's put a huge amount of weight on Don's Haskins, which he cited, but without a reply brief, we don't have your answer to that authority. Likewise, he's got an entire section in his brief as to justification with supporting Supreme Court opinion, but without a reply brief, we've got no answer. So it's a three-part question. Don's Haskins, number two, Texas beef, number three, why do we even consider any counterargument you've made? If he preserved the justification argument, he briefed it, and we had no answer from you. Well, the justification argument is addressed in our brief as it was addressed in the motion for summary judgment below, and that is that he doesn't have that argument. We, at the time of ADT's action, had an exclusivity provision with the Homeowners Association. There was an overlap. The HOA's management company, there was an overlapping period of time where we had an exclusivity period that had not expired, and ADT's exclusivity period started. There's summary judgment evidence. We gave ADT notice that we had that and that we had those contracts and that they could not interfere with our end. So your response to Texas beef is what? Our response to Texas beef is it doesn't apply. Texas beef is the parking lot case, as I recall. The parking lot services are completely ancillary to the lease. This is a completely different thing. As you said, we have two separate contracts, contracts with individual homeowners and contracts with the HOA. Let me ask you a question about the structure here. Many homeowners associations, certainly in Texas, will in turn contract with a management service, obviously. In fact, I think most of the large developments, they do. And so the Homeowners Association board or the residents, as far as the ongoing management, the details and many things, they contract that out to a number of professional companies who manage it. There's a large industry in managing those by outside companies. Right. What I'm not clear about in this thing is exactly how that's operated in the context of the way HOAs actually operate. Well, usually an HOA will contract with a separate third-party property management service, will sign a contract with the property management service. No contract in this case with Insight that we're aware of. No written contract at all. But there also, then, the HOA may very well say that certain decisions may have to be uniformly applied. We're going to operate a deer lease so we get the benefit of taxes, et cetera, and everybody's got to participate in that. So you have that. HOAs aren't necessarily a democratic institution fully, so they can't elect them, but that's a source of a lot of friction and litigation. I agree with that. The problem is that under the Texas Private Security Act, no entity. I understand. There's a case on cities, and HOA can provide security alarm services. That's why it requires an independent, individual contract between the security company and the homeowner so that only the homeowner can control that. Otherwise, you could have an HOA decide, you're behind in your dues, Judge Seward. I have a question. You're turning off your security system. But suddenly all these homeowners signed up with ADT, or how many of them signed up with ADT? I think at the time of trial, we had a number. I'm not exactly sure how many of them did. The majority of them did, but they all did that based upon the false representation that you would have no monitoring service whatsoever unless you allowed it. You asked the number, so you gave the number. Don't get an argument, too. I don't know the number. It should be in the record. All right, that's good. I'm going to stop you there, Mr. Seward. Thank you, Your Honor. Mr. Frick, Ms. Seward, we appreciate your briefing and your argument in the case. The case will be submitted. We'll get it decided.